PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

FREDERICK E. BOUCHAT,
               *Plaintiff-Appellant,*

v.

THE BON-TON DEPARTMENT STORES,
INCORPORATED; BURLINGTON COAT
FACTORY WAREHOUSE OF MARYLAND,
INCORPORATED; BURLINGTON COAT
FACTORY WAREHOUSE OF ANNAPOLIS,
INCORPORATED; BURLINGTON COAT
FACTORY OF GAITHERSBURG,
INCORPORATED; BURLINGTON COAT
FACTORY WAREHOUSE OF SECURITY,
INCORPORATED; BURLINGTON COAT
FACTORY WAREHOUSE OF BALTIMORE,
INCORPORATED; BURLINGTON COAT
FACTORY WAREHOUSE OF
REISTERTOWN, INCORPORATED;
BURLINGTON COAT FACTORY
WAREHOUSE OF COLUMBIA,
INCORPORATED; BURLINGTON COAT
FACTORY WAREHOUSE OF GREENBELT,
INCORPORATED; BURLINGTON COAT
FACTORY WAREHOUSE OF GLEN
BURNIE, INCORPORATED; BURLINGTON
COAT FACTORY WAREHOUSE OF
FREDERICK, INCORPORATED;
BURLINGTON COAT FACTORY
WAREHOUSE OF JESSUP,

No. 03-2173

INCORPORATED; BURLINGTON COAT FACTORY WAREHOUSE OF WALDORF, INCORPORATED; BURLINGTON COAT FACTORY WAREHOUSE OF TOWSON, INCORPORATED; BURLINGTON COAT FACTORY WAREHOUSE OF CITY PLACE, INCORPORATED; BURLINGTON COAT FACTORY WAREHOUSE OF HUNT VALLEY, INCORPORATED; COLLECTORS EDGE OF TENNESSEE, INCORPORATED; ESPN, INCORPORATED; FOTOBALL USA, INCORPORATED; FRANK SUSSMAN, COMPANY; GIANT FOOD INCORPORATED; HOME BOX OFFICE OF WARNER BROTHERS AND TIME WARNER, INCORPORATED; NISSAN MOTOR ACCEPTANCE CORPORATION; STARWOOD OPERATING, INCORPORATED, a/k/a Starwood Asset Services, Incorporated, t/a Sheraton Hotels; STARWOOD HOTELS & RESORTS, t/a Sheraton Hotels; THE SPORTS AUTHORITY, INCORPORATED; VALUE CITY DEPARTMENT STORE; AMERICAN GREETINGS-ACG, INCORPORATED; STARWOOD HOTELS & RESORTS WORLDWIDE, INCORPORATED, t/a Sheraton Hotels,

*Defendants-Appellees,*

and

K-MART CORPORATION; BALFOUR
COMPANY; BORDERS GROUP;
COPELAND'S SPORT STORES; CVS;
WAL-MART ASSOCIATES,
INCORPORATED; WAL-MART STORES,
INCORPORATED; WAL-MART STORES
EAST, INCORPORATED; WAL-MART
REALTY COMPANY; TRIPP
DISTRIBUTORS, INCORPORATED; DELTA
APPAREL INCORPORATED; EASTPORT
CORPORATION; ESPN INTERNET
VENTURES, a/k/a ESPN Network,
a/k/a ESPN Internet Group; FOGDOG,
INCORPORATED; GROUP W TELEVISION,
INCORPORATED; THE MAY
DEPARTMENT STORES COMPANY, t/a
The Hecht Company; KW TEXTILES,
INCORPORATED; MAJOR LEAGUE
VACATIONS; NASCAR BANNER PLUS;
NFL SHOP; NFL STORE, a/k/a The
Best NFL Store; R. KAUFMAN
JEWELERS; NFL JEWELRY; NISSAN
AUTO RECEIVABLES CORPORATION, II;
NISSAN NORTH AMERICA,
INCORPORATED; ONEITA INDUSTRIES,
INCORPORATED; PROTEAM COM,
INCORPORATED, a/k/a Proteam.com
2000; PUMA NORTH AMERICA; RAND
MCNALLY COMPANY, a/k/a Rand
McNally & Company; ROCKY
MOUNTAIN SPORT; RITE AID

CORPORATION; ROYAL VENDORS, INCORPORATED; SHOP AT HOME, INCORPORATED; SONY CORPORATION; TARGET CORPORATION; TICKET WAREHOUSE; TKO MARKETING; TV GUIDE, INCORPORATED; SKYMALL, INCORPORATED; WALDEN BOOK COMPANY, INCORPORATED; WEST COAST NOVELTY CORPORATION; HASBORO PROMOTIONS AND DIRECT, INCORPORATED, t/a Starting Lineup Collector Club; INFINITY BROADCASTING CORPORATION, t/a WJFK Radio, t/a WLIF Radio, a/k/a Infinity Broadcast Corporation of Maryland, a/k/a Infinity Broadcasting Corporation of Washington, D.C., a/k/a Infinity Broadcast Corporation of Chesapeake; RHODE ISLAND NOVELTY; SUNTRUST BANK, a/k/a Crestar Bank, N.A.; ONLINE SPORTS, a/k/a OnlineSports.com; SPORTSLINE.COM, INCORPORATED, a/k/a Sportsline & Sportsline.com, a/k/a Sportsline USA, Incorporated,

*Defendants.*

FREDERICK E. BOUCHAT,
            *Plaintiff-Appellant,*

v.

CHAMPION PRODUCTS, INCORPORATED;
AA WORLD CLASS EMBROIDERY
EMBELLISHMENT; ABBACUS,
INCORPORATED; ABC, INCORPORATED;
ABC SPORTS, INCORPORATED; A.D.
SUTTONS & SONS; ACCESSORY
NETWORK; ACCLAIM ENTERTAINMENT;
ACCOLADE, INCORPORATED;
ACCUDART; ADIDAS AMERICA; AERIAL
SPORTS PHOTOGRAPHY, INCORPORATED;
AMA INTERNATIONAL GROUP;
AMERICAN NEEDLE & NOVELTY,
INCORPORATED; AMINCO
INTERNATIONAL INCORPORATED;
ANDREW NOCH & ASSOCIATES; ANGEL
LAKE MULTIMEDIA, INCORPORATED;
ANHEUSER-BUSCH COMPANIES, INC.;
ANSA KIDS, INCORPORATED; THE
ANTIGUA GROUP, INCORPORATED;
ANTONE'S GOURMET GIFTS; AQUARIUS
LIMITED; ATHLETIC SUPPLY OF
DALLAS; AUDREY CREATIVE TABLE
LINEN; AUTOGRAPHED BALL
COMPANY; BABY FAIR, d/b/a
BabyFair, Incorporated; BARRELL
SPORTSWEAR; BELDING SPORTS; BELL
ATLANTIC MOBILE, INCORPORATED, t/a
Bell Atlantic Corporation; BERNIE
KOSAR GREETING CARD COMPANY;
BEST COMPANY, INCORPORATED, a/k/a
Treat Entertainment; BEST
EQUIPMENT;

No. 03-2174

BEST PERSONALIZED BOOKS; BETRAS PLASTICS; BIC CORPORATION; BIG LEAGUE PROMOTIONS; BIKE ATHLETIC COMPANY; BNOX, INCORPORATED; BOND DISTRIBUTING COMPANY; BOTTOM LINE IMAGES; BRANDON APPAREL GROUP, INCORPORATED; BUFFALO GAMES, INCORPORATED; BULOVA CORPORATION; CBS CORPORATION GROUP, d/b/a CBS Corporation; C & I LEASING INCORPORATED; CABLE NEWS NETWORK, INCORPORATED; CAMBRIDGE FOOTWEAR GROUP, LIMITED; CAMPBELL SOUP COMPANY; CANNON USA, INCORPORATED; CARRETTA SPORT INCORPORATED; CASABLANCA FAN COMPANY; CASEWORKS INTERNATIONAL; CASTROL NORTH AMERICA, INCORPORATED; CHAMPION GLOVE; CHESTNUT HILL MARKET; CHICAGOLAND PROCESSING CORPORATION; CINCINNATI BENGALS, INCORPORATED; CLASSIC BALLOON CORPORATION; CLEO, INCORPORATED; THE COCA-COLA COMPANY; COLGATE PALMOLIVE COMPANY; COLLECTOR'S EDGE L.P.; COLLEGE CONCEPTS; COLOR-CLINGS, INCORPORATED, d/b/a The Paper Magic Group, Incorporated; COLORES INTERNATIONAL, INCORPORATED, t/a Division of Wincraft Incorporated; COLUMBIA TEL-COM; COLUMBIA TELECOMMUNICATIONS; COOPERSTOWN BEARS LIMITED;

COORDINATED STRATEGIC ALLIANCES INCORPORATED; CORINTHIAN, INCORPORATED; COSTACOS BROTHERS SPORTS; CROWN OIL & GAS COMPANY; CROWNMARK; CSS INDUSTRIES, INCORPORATED; CUI, INCORPORATED, (Metallic Images); CUSTOM CRIBBAGE, INCORPORATED; CYBRCARD; D. GLASGOW & SONS, INCORPORATED; DALLAS COWBOYS; DANBY PRODUCTS, INCORPORATED; DAY DREAM PUBLISHING; DERIVATIVE WORKS, INCORPORATED; DICK'S CLOTHING & SPORTING GOODS, INCORPORATED; DIRECT IMPULSE DESIGN; DISNEY PRESS/HYPERION BOOKS; DIXIE SEAL & STAMP COMPANY, INCORPORATED; DOUBLE TREE HOTEL CORPORATION; DSJ & ASSOCIATES; DUCK HOUSE; DYNASTY APPAREL INDUSTRIES; E & J GALLO WINERY; EASTMAN KODAK COMPANY; EASTON SPORTS, INCORPORATED; ELLER MEDIA COMPANY; EMERSON USA; EQUITY SPORTS, d/b/a Equity Marketing Incorporated; ERTL COMPANY, INCORPORATED; ESPN, INCORPORATED; ESSEX MANUFACTURING COMPANY; EXCLUSIVE PRO SPORTS; FABRIC TRADITIONS, d/b/a N.T.T., Incorporated; FANTASMA; FIBERLOK, INCORPORATED; FINE HOST CORPORATION; FIT FOR SPORTS; FLEER CORPORATION; FOOT-TEC INDUSTRIES;

FORD MOTOR COMPANY; FOSSIL, INCORPORATED; FOSTER INDUSTRIES, INCORPORATED; FOX ENTERTAINMENT GROUP, INCORPORATED; FRANCO APPAREL GROUP, INCORPORATED; FRANKLIN SPORTS INDUSTRIES, INCORPORATED; FREMONT DIE CONSUMER PRODUCTS, INCORPORATED; FRONT PAGES COMPANY; FSC WALLCOVERINGS; GALOOB TOYS, INCORPORATED; GARAN INCORPORATED; GENERAL MILLS, INCORPORATED; GENESIS DIRECT, INCORPORATED; GFG INCORPORATED; GILL APPAREL GROUP/CARL BANKS; GOOD STUFF CORPORATION; GREAT AMERICAN PRODUCTS, INCORPORATED; GRIDIRON GOLF; GRIDIRON GROUP; GROSSMAN CAP COMPANY INCORPORATED; H & H FURNITURE MANUFACTURING, INCORPORATED; HADDAD APPAREL GROUP LIMITED; HALLMARK EMBLEMS, INCORPORATED; HALLMARK LICENSING; HASBRO, INCORPORATED; HASBRO TOY COMPANY; HASBRO TOY GROUP; HEAD GAMES; HELENE CURTIS, INCORPORATED; HERSHEY FOOD CORPORATION; HIGHGATE PRODUCTS LLC; HIGHLAND MINT; HOME INNOVATIONS; HOST APPAREL; HOT SAUCE HARRY'S; HPI; HUNTER MANUFACTURING GROUP; HUNTER MEDIA; HUTCH SPORTS USA; ICHAUWAY MILLS INCORPORATED; IDENTITY, INCORPORATED; IDEAL RUBBER

PRODUCTS COMPANY; ILLINOY TOY, (Candy Cargo); IMC PRODUCTS CORPORATION; IMPRINTED PRODUCTS CORPORATION; INDIANAPOLIS COLTS; INNOVO GROUP INCORPORATED; INVENTURE DISK; IRON KNIGHTS/CHININ USA INCORPORATED; ITS ACADEMIC; JACKSONVILLE JAGUARS, t/a Jacksonville Jaguars, Limited; J.D. HEALY SPECIALTIES, INCORPORATED; J.F. SPORTS COMPANY; J.W. ENVISIONS, d/b/a Ultimate Vision; JAY FRANCO AND SONS, INCORPORATED; JEFF HAMILTON; JESTER COMPANY; JOHN F. TURNER & COMPANY, INCORPORATED; JOHN H. HARLAND COMPANY; JOY ATHLETIC; KANSAS CITY CHIEFS, t/a Kansas City Chiefs Football Club, Incorporated, FOOTBALL CLUB, INCORPORATED; KELLY RUSSELL STUDIOS, INCORPORATED; KEN NORTON JR.'S STARS & LEGENDS; KENNER PRODUCTS; KOOL SPORT; KOOLER KRAFT; KRAFT FOODS, INCORPORATED; KURT S. ADLER; LA RUE INTERNATIONAL; LEGENDS ATHLETIC; LIGHTFOOT PHOTOGRAPHY; LIMITED TREASURES, INCORPORATED; LOGO ATHLETIC, INCORPORATED; LUMATEC INDUSTRIAL; MAJESTIC ATHLETIC WEAR, LIMITED; MBI, INCORPORATED; MBNA AMERICA, a/k/a MBNA Marketing Systems, Incorporated, a/k/a MBNA Corporation, a/k/a MBNA America Bank, NA;

MCARTHUR TOWELS, INCORPORATED;
MCKIMSON PRODUCTIONS,
INCORPORATED; THE MEAD
CORPORATION; MELTZER INDUSTRIES;
MGI USA INCORPORATED; MGWHIZ,
INCORPORATED; MIAMI DOLPHINS, t/a
Miami Dolphins, Limited; MICHAEL
ANTHONY JEWELERS, INCORPORATED;
MICROSOFT CORPORATION; MID-
ATLANTIC BOTTLING, LIMITED;
MIDWAY GAMES, INCORPORATED;
MIDWEST SWISS EMBROIDERIES
COMPANY, INCORPORATED; MIGGLE
TOYS, INCORPORATED; MILLER
BREWING COMPANY; MIND POWER;
MINE SAFETY APPLIANCES COMPANY;
MINNESOTA VIKINGS; MIRAGE,
Division of Elliot Kastle,
Incorporated; HENRY MODELL &
COMPANY, INCORPORATED, a/k/a
Modell's Maryland, Incorporated,
a/k/a Modell's, Incorporated;
MORETZ MILLS, INCORPORATED;
MOTION VISION; MOTOROLA,
INCORPORATED; MOUNTED MEMORIES,
INCORPORATED; MUSEUMS EDITIONS,
LIMITED; NANCO, Nancy Sales
Company; NARDI ENTERPRISES,
INCORPORATED; NATIONAL
BROADCASTING COMPANY,
INCORPORATED; NATIONAL DESIGN
CORPORATION; NATIONAL
EMBROIDERED EMBLEM, a/k/a
National Emblem, Incorporated;

NATIONAL MAT; NEW ENGLAND PATRIOTS, t/a New England Patriots L.P.; NEW ERA CAP COMPANY, INCORPORATED; NEW LIFE ART, INCORPORATED; NEW ORLEANS SAINTS, t/a New Orleans Louisiana Saints Limited Partnership; NEW YORK GIANTS, t/a New York Football Giants, Inc.; NEW YORK JETS, t/a New York Jets Football Club, Incorporated; NFL ENTERPRISES LP, a/k/a NFL Enterprises Incorporated; NFL, INCORPORATED, a/k/a National Football League, Incorporated; NATIONAL FOOTBALL LEAGUE, INCORPORATED FILMS, a/k/a NFL Films, Incorporated; NICHOLAS SIMON COMPANY; NIKE, COMPANY; NIKE, INCORPORATED; NORMAN JAMES COMPANY, LIMITED, a/k/a Norman James International Corporation; NORTH AMERICAN BOOT COMPANY; NTN COMMUNICATIONS, INCORPORATED; NUTMEG MILLS, VF Corporation; OAKLAND RAIDERS, a/k/a The Oakland Raiders; OAKLEY, INCORPORATED; ORANGE PRODUCTS, INCORPORATED; OUTERSTUFF CORPORATION, d/b/a Outerstuff, Limited; OVERTIME SPORTS, INCORPORATED; OXBORO OUTDOORS; P&K PRODUCTS COMPANY, INCORPORATED, a/k/a PK Products Company; PACIFIC TRADING CARDS, INCORPORATED; PAPEL/FREELANCE INC; PAUL ARPIN VAN LINES, INCORPORATED; PENQUIN

PRODUCTS, INCORPORATED; PENNINSULA VENDING, INCORPORATED; PENTAGRAM, INCORPORATED, Best Bets; PENTECH INTERNATIONAL, INCORPORATED; PEPSICO, INCORPORATED; PEPSI-COLA OPERATING COMPANY OF CHESAPEAKE & INDIANAPOLIS; PETER DAVID, INCORPORATED; PHILADELPHIA EAGLES, t/a The Philadelphia Eagles Football Club, Inc.; PHOTO FILE INCORPORATED; PICTURE ME BOOKS; PINE HOSIERY MILLS, INCORPORATED; PINNACLE BRANDS, INCORPORATED; PITTSBURGH STEELERS, t/a Pittsburgh Steelers Sports, Incorporated; PIQUE EMBROIDERY; PLAYOFF CORPORATION; PLYMOUTH, INCORPORATED, d/b/a P.A. Plymouth, Incorporated; POSITIVE IMAGE BRACING SYSTEM; PREMIER CONCEPTS INCORPORATED; PRO CUBE, INCORPORATED; PRO ELITE, INCORPORATED; PRO LOOK, INCORPORATED; PRO MOVES INTERNATIONAL, INCORPORATED; PRO STARR LLC; PRO-PELLER DIV/IMC PRODUCTS; PROCTOR & GAMBLE; PROGRESSIVE INSURANCE, d/b/a Progressive Casualty Insurance Company; PROVIDENT BANK OF MARYLAND; PSINET, d/b/a PSINet, Incorporated; PYRAMID, INCORPORATED, d/b/a Pyramid Accessories, Incorporated; QUAKER

OATS COMPANY, a/k/a The Quaker Oats Company; RACING CHAMPIONS, INCORPORATED; RALPH MARLIN & COMPANY, INCORPORATED; RCA CONSUMER ELECTRONICS; REEBOK INTERNATIONAL LIMITED; REGAL WARE, INCORPORATED; RENAISSANCE EDITIONS; RHODE ISLAND NOVELTY, a/k/a Rhode Island Novelty, Incorporated; RICO INDUSTRIES, INCORPORATED; RIDELL INCORPORATED; RIVAL COMPANY; ROSSMOR INDUSTRIES; ROXBURY INDUSTRIES, d/b/a Roxbury Industries Corporation; RUSS BERRIE & COMPANY, INCORPORATED; RUSSELL ATHLETIC; RUSSELL CORPORATION; SAN DIEGO CHARGERS, t/a Chargers Football Company; SAN FRANCISCO 49ERS, t/a San Francisco Forty Niners, Limited; SANCTUARY WOODS MULTIMEDIA; SANFORD BEROL USA, a/k/a Sanford L.P.; SARANAC GLOVE COMPANY; SARA LEE KNIT PRODUCTS, d/b/a Sara Lee Corporation; SASSI, a/k/a Sassi, Incorporated; SCHUESSLER KNITTING MILLS; SCOTT EDITIONS; SDI TECHNOLOGIES; SEARS ROEBUCK AND COMPANY; SEATTLE SEAHAWKS, t/a Football Northwest LLC; SEGA OF AMERICA, INCORPORATED; SEVEN SONS & COMPANY, INCORPORATED; SHAW CREATIONS, INCORPORATED; SHIARA HOLDINGS; SHIRT XPLOSION; SHOEWARE; SIERRA SUN EDITIONS;

SIGNAL APPAREL COMPANY, INCORPORATED; SIMPSON PRODUCTS; SISKIYOU BUCKLE COMPANY; SMART DOG PRODUCTS, d/b/a Smart Dog Products, Incorporated; SMITHMARK PUBLISHING, INCORPORATED; SNAP ON TOOLS, d/b/a Snap-on Technologies, Incorporated; SONY INTERACTIVE; SOUTHERN MARYLAND IMPORTS, INCORPORATED; SOUTHWEST AIRLINES; SPORT COOK, INCORPORATED; SPORTACULAR ART; SPORTS ACCESSORIES; SPORTS COVERAGE; SPORTS ILLUSTRATED MAGAZINE, a/k/a Time Inc.; SPORTS SECTION; SPORTSCAST; SPORTSPRO MARKETING; SPORTSTAR; SPRINT COMMUNICATIONS COMPANY L.P.; ST. LOUIS RAMS, t/a St. Louis Rams Partnership; STAPLES, INCORPORATED, d/b/a Staples the Office Superstore, Incorporated; STARLINE, INCORPORATED, a/k/a Starline Novelties Incorporated; STARTER CORPORATION; STARWAVE CORPORATION; STERLING SPORTS, INCORPORATED; STUFFINS, INCORPORATED; STYLUS; SUBTLE PERFECTION; SUGAR PLUM; SUN TIME ENTERPRISES, INCORPORATED; SUNCAST CORPORATION; SWISS ARMY BRANDS, d/b/a Swiss Army Brands, Incorporated; SWISS MAID; TABLETOP ENTERPRISES; TAMPA BAY BUCCANEERS; TEAM EDITIONS AUTO; TEAM GOLF; TEAMWORKS, INCORPORATED; TENNESSEE TITANS;

TERRISOL, d/b/a Terrisol Corporation; TERRY MANUFACTURING; THE BRADFORD EXCHANGE; THE NORTHWEST COMPANY, d/b/a Wilmington Products USA Incorporated; THE PARTY ANIMAL, INCORPORATED; THE PASTA SHOPPE; THE SNACK FACTORY, INCORPORATED; THE TOPPS COMPANY, INCORPORATED; THE UPPER DECK COMPANY, LLC; WALT DISNEY COMPANY, INCORPORATED; THE WORMSER COMPANY; THERMO-SERV, INCORPORATED; TIME WARNER ENTERTAINMENT COMPANY, L.P.; TITLEIST AND FOOTJOY WORLDWIDE; TOON ART, INCORPORATED; TOPPERSCOT, INCORPORATED, d/b/a T. Swanson Incorporated; TOY & SPORT TRENDS, INCORPORATED; TREASURE CHEST NOVELTY CORPORATION; TRIUMPH PUBLISHING; TULTEX CORPORATION, Logo Athletic; TUNDRA/STANDARD KNITTING INCORPORATED; TURBO SPORTSWEAR, INCORPORATED, d/b/a Turbo Holding Incorporated; TURNER NATIONAL TELEVISION; TWENTY FOURTH AND DEAN, INCORPORATED; TWINS ENTERPRISES, INCORPORATED; ULTIMATE VISION; UNIQUE PREMIUM PRODUCTS; UNIQUE SPORTS GENERATION; UNIVERSAL HEIGHTS, INCORPORATED; UNIVERSAL MARKETING ASSOCIATES, INCORPORATED; USA GAMES; USA LICENSED BOWS; UVEX SAFETY,

INCORPORATED; V. FRAAS, d/b/a V. Fraas (USA) Incorporated; VERMONT TEDDY BEAR, d/b/a The Vermont Teddy Bear Company, Incorporated; VF KNITWEAR, INCORPORATED; VOYAGER EMBLEMS, INCORPORATED; WASHINGTON REDSKINS; WATERFORD WEDGEWOOD USA, INCORPORATED; WELLS LAMONT; WEMCO; WHITE ROSE COLLECTIBLES; WILLIAMS ELECTRONIC GAMES, INCORPORATED; WILLIAMS INDUSTRIES, INCORPORATED; WILLOW HOISERY COMPANY, INCORPORATED; WILSON SPORTING GOODS, COMPANY; WINCRAFT, INCORPORATED; WINNER DISTRIBUTING COMPANY; WORKMAN PUBLISHING COMPANY, INCORPORATED; XEROX CORPORATION; ZIPPO MANUFACTURING COMPANY; 4 SPORTS INCORPORATED; 989 STUDIOS; PEPSI-COLA METROPOLITAN BOTTLING COMPANY, INCORPORATED; CUSTOM EDGE, INCORPORATED; GLOBAL RECOGNITION; J. C. PENNEY COMPANY, INCORPORATED; VENATOR GROUP, INCORPORATED, t/a Champs Sports, t/a Foot Locker, a/k/a Venator Retail Group, Incorporated; MOUSE PRODUCTS, INCORPORATED; B&B HOLDINGS, INCORPORATED, d/b/a Arizona Cardinals; AT-A-GLANCE CORPORATION, t/a The Mead Corporation, d/b/a At-A-Glance

Group, a subsidiary of the Mead Corporation; THE FIVE SMITHS, INCORPORATED, d/b/a Atlanta Falcons; AURAFIN LLC; AUTHENTIC IMAGES, INCORPORATED; BENTLEY LINGERIE, INCORPORATED, a/k/a Bentley; BUFFALO BILLS, INCORPORATED, a/k/a Buffalo Bills; RICHARDSON SPORTS LIMITED PARTNERSHIP, d/b/a Carolina Panthers; CHICAGO BEARS FOOTBALL CLUB, INCORPORATED, a/k/a Chicago Bears; COMMEMORATIVE BRANDS, INCORPORATED; CROWN CRAFTS, INCORPORATED; CROWN CENTRAL LLC; CROWN PRO, INCORPORATED; DENVER BRONCOS FOOTBALL CLUB, a/k/a Denver Broncos; THE DETROIT LIONS, INC.; BUENA VISTA BOOKS; DREW PEARSON MARKETING, INCORPORATED; ELECTRONIC ARTS INCORPORATED; FLEER SKY/BOX INTERNATIONAL, LP; FOLEY-MARTENS COMPANY; FOR BARE FEET, INCORPORATED; A.R.C. HOLDINGS, LIMITED, d/b/a Fox Sports Direct; F. SCHUMAKER & COMPANY, a/k/a Village Wall Coverings; GENERAL MILLS SALES, INCORPORATED; GREEN BAY PACKERS, INCORPORATED; HALLMARK CARDS, INCORPORATED; CANDY CARGO; MCDONALD'S CORPORATION; PAPEL GIFTWARE, INCORPORATED; THE

Pfaltzgraff Company; Thomson Consumer Electronics, Incorporated; Triatic, Incorporated; Kentex; Licensed Lifestyles, Incorporated, d/b/a Tag Express; Dan River Incorporated; Coca-Cola Enterprise, d/b/a The Mid-Atlantic Coca-Cola Bottling Company, d/b/a The Mid-Atlantic Coca-Cola Bottling Company; Timezone Products; Turner Network Television, LP, LLP; SBM, Incorporated, d/b/a Scoreboard Memories; Bacou USA Safety, Incorporated; Pro Football, Incorporated; Nike Retail Services, Incorporated; NFL Productions, LLC; McMeel Publishing, formerly known as Andrews & McMeel; Biederlack of America, d/b/a Cushion Craft Andrews & McMeel; Biederlack of America, d/b/a Cushion Craft Biederlack Corporation; Vivendi Universal Games, Incorporated, formerly known as Cendant Software Corporation; Sierra Entertainment, Incorporated, formerly known as Sierra On-Line, Incorporated; Donruss Playoff; Summit America Television, Incorporated, formerly known as Shop at Home Incorporated; Football Northwest LLC; Tennessee Football, L.P.,

d/b/a Cumberland Football Management, Incorporated; BOW LINE FAMILY PRODUCTS, d/b/a BowLine Family Products; CENDENT SOFTWARE; GOLDEN GOLF; KITTRICH CORPORATION; KR INDUSTRIES INCORPORATED; MILTON BRADLEY, d/b/a Hasbro, Incorporated; SIERRA ONLINE; LIFESTYLES, INCORPORATED, d/b/a Tag Express; TREAT ENTERTAINMENT; VF KNITWEAR, INCORPORATED; VILLAGE WALL COVERINGS; XPRESS CORPORATION,

*Defendants-Appellees,*

and

ACTION IMAGES, INCORPORATED; ADAMS U.S.A., INCORPORATED, d/b/a Neuman Tackified Glove; ALLURE HOME CREATION COMPANY, INCORPORATED; AMERICA'S SWEETHEART; BARON GROUP, INCORPORATED; ALPHABET CITY RECORDS, INCORPORATED; BIG FORK BOOT COMPANY; BRIMMS, INCORPORATED; DOLLY, INCORPORATED; EVERLASTING IMAGES, INCORPORATED; FOOT LOCKER; FOTO FANTASY; FREMONT CONSUMER DIE; FRUIT OF THE LOOM, LIMITED; FUJI PHOTO FILM; FUTECH DESIGNS; G-III APPAREL GROUP, LIMITED; GILMAN GEAR; GLOBAL ONE DISTRIBUTION &

MERCHANDISING; GOLDEN HARVEST POPCORN, INCORPORATED; GOTTA GO, INCORPORATED, d/b/a Head Sokz; HARPER COLLINS; HOUSTON HARVEST GIFT PRODUCTS, LLC; KIMBERLY CLARK CORPORATION; MAXIT DESIGNS; PLAY-BY-PLAY TOYS & NOVELTIES; PRO TEAM PLAYABLES; SALVINO, INCORPORATED; SCORE BOARD; SIMPLICITY MANUFACTURING; SPORTS SPECIALTIES; TASCO SALES, INCORPORATED; TEAM MOUSE; UNITED PARCEL SERVICE, INCORPORATED; US PLAYING CARD COMPANY; WARNER BROTHERS; YORK BARBELL COMPANY, INCORPORATED; THE BIBB COMPANY, d/b/a Dan River Incorporated,
*Defendants.*

FREDERICK E. BOUCHAT,
*Plaintiff-Appellant,*

v.

BALTIMORE RAVENS LIMITED PARTNERSHIP; BALTIMORE RAVENS FOOTBALL CLUB, INCORPORATED; BALTIMORE STADIUM COMPANY, LLC,
*Defendants-Appellees.*

No. 03-2389

FREDERICK E. BOUCHAT,
                    *Plaintiff-Appellant,*

                    v.                              No. 04-1008

7-ELEVEN,

                    *Defendant-Appellee.*

Appeals from the United States District Court
for the District of Maryland, at Baltimore.
Marvin J. Garbis, Senior District Judge.
(CA-01-1996-1-MJG; CA-99-1576-1-MJG; CA-01-647-MJG;
CA-03-2229-MJG)

Argued: September 21, 2005

Decided: October 17, 2007

Before NIEMEYER and MICHAEL, Circuit Judges, and
WIDENER,[1] Senior Circuit Judge.

Affirmed by published opinion. Judge Michael wrote the opinion in
which Judge Niemeyer joined. Judge Niemeyer wrote a separate con-
curring opinion.

## COUNSEL

**ARGUED:** Howard J. Schulman, SCHULMAN & KAUFMAN,
L.L.C., Baltimore, Maryland, for Appellant. Robert Lloyd Raskopf,
WHITE & CASE, New York, New York, for Appellees. **ON BRIEF:**
George Beall, HOGAN & HARTSON, L.L.P., Baltimore, Maryland;

[1]Judge Widener heard oral argument in this case but died prior to the
time the decision was filed. The decision is filed by a quorum of the
panel. 28 U.S.C. § 46(d).

Marc E. Ackerman, WHITE & CASE, New York, New York, for Appellees.

---

**OPINION**

MICHAEL, Circuit Judge:

This is the latest in a series of appeals in copyright infringement cases arising out of the design and use of the logo for the Baltimore Ravens football team. In the first case, which concluded in 2004, Frederick E. Bouchat sued the Baltimore Ravens, Inc. (the Ravens) and National Football League Properties, Inc. (NFLP), alleging that these defendants had copied one of his drawings in choosing a logo for the Ravens. A jury considering liability found that the Ravens and NFLP had infringed Bouchat's copyright in the drawing, but a second jury considering damages awarded none. We affirmed in each of two appeals. In the four cases before us today, Bouchat sues several hundred companies (licensees) that used the infringing logo in various endeavors, including the production and marketing of official Ravens merchandise. In summary judgment proceedings in these cases, the district court held that the licensees had infringed Bouchat's copyright, but denied his requests for actual or statutory damages. Bouchat appeals the judgments, and we affirm. We conclude that the doctrine of claim preclusion prevents Bouchat from obtaining actual damages from the licensees and that his failure to register his copyright before infringement began renders him ineligible for statutory damages.

I.

A.

In November 1995 the National Football League announced that the Cleveland Browns team was moving to Baltimore. The Browns name, however, was to be left in Cleveland, which required the relocated team to select a new name. Bouchat, an amateur artist who worked as a security guard in Baltimore, sketched several logos illustrating names (including the Ravens) being considered by the newly arrived team. On December 5, 1995, Bouchat drew a logo with a

shield bearing the letter B and held by a raven (the Shield drawing). In March 1996 the Ravens name was officially chosen, and the NFL's marketing arm, NFLP, hired artists to begin logo design. On April 1 or 2, 1996, Bouchat faxed his Shield drawing to the Maryland Stadium Authority with a note asking the authority's chairman to send the drawing to the Ravens' owner. The note said that if the Ravens used his logo, Bouchat wanted a letter of recognition and an autographed helmet. After the Ravens had access to Bouchat's drawing, NFLP's artists created a logo called the Flying B. The Flying B depicted a winged shield bearing the letter B, and this logo bore a remarkable resemblance to Bouchat's Shield drawing. The Ravens team presented the Flying B to the public for the first time in June 1996, and the team used this logo until the end of the 1998 season. During the time the Flying B was the team logo, the NFLP licensed it as part of a package of all NFL team logos to hundreds of manufacturers and retailers for use on Ravens merchandise. The team never gave Bouchat the recognition letter or autographed helmet he had requested. On July 25, 1996, Bouchat registered the Shield drawing with the U.S. Copyright Office.

In May 1997 Bouchat filed a copyright infringement action against the Ravens and NFLP in the U.S. District Court for the District of Maryland, *Bouchat v. Baltimore Ravens, Inc.* (*Bouchat I*), No. MJG-97-1470. He alleged that the Flying B infringed his copyright in the Shield drawing and that the defendants had earned profits from licensing the infringing work. The district court bifurcated the case into liability and damages phases. The jury in the liability phase found that the Ravens and NFLP had infringed Bouchat's copyright, and we affirmed in an interlocutory appeal. *Bouchat v. Baltimore Ravens, Inc.*, 228 F.3d 489 (4th Cir. 2000), *amended by and reh'g en banc denied by* 241 F.3d 350 (4th Cir.), *cert. denied*, 532 U.S. 1038 (2001).

In *Bouchat I*'s damages phase Bouchat sought recovery under 17 U.S.C. § 504(a)(1), which allows a copyright owner to obtain actual damages plus any additional profits of the infringer. Bouchat claimed no actual damages but did seek infringer profits. Before the damages issue was submitted to the jury, the district court decided that the only component of the defendants' profits that could be attributed to the infringement for § 504(b) purposes was revenue from the sale of products bearing the Flying B. The jury then found that the defen-

dants' income from such products "was attributable completely to factors other than the artwork of the Flying B." J.A. 388. The district court entered judgment for the defendants on the jury's finding that Bouchat was entitled to no damages, and we affirmed, *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514 (4th Cir. 2003), *cert. denied*, 541 U.S. 1042 (2004).

B.

In the meantime, Bouchat brought four additional actions, which are the subject of this appeal, against several hundred "downstream defendants" for copyright infringement: *Bouchat v. Champion Prods., Inc.*, No. MJG-99-1576 (D. Md.) (*Bouchat II*); *Bouchat v. Baltimore Ravens Ltd. P'ship*, No. MJG-01-0647 (D. Md.) (*Bouchat III*); *Bouchat v. K-Mart Corp.*, No. MJG-01-1996 (D. Md.) (*Bouchat IV*); and *Bouchat v. 7-Eleven, Inc.*, No. MJG-03-2229 (D. Md.) (*Bouchat V*). Bouchat describes these downstream defendants as "NFL-related entities . . . who utilized the infringing work in advertisements, publishers of game day magazines, broadcast and media entities which licensed the use of the infringing logo," and makers of video games, trading cards, and other products that displayed the Ravens' Flying B. Appellant's Br. at 4-5. All of the downstream defendants used the logo with permission from NFLP, and NFLP required all of its licensees to submit proposed logo use to NFLP for approval. (Because every downstream defendant used the logo with either direct or indirect authorization from NFLP, we will refer to all of the downstream defendants as "licensees.") The district court held these four related cases in abeyance while it dealt with *Bouchat I*.

When *Bouchat I* concluded in the district court, litigation resumed in *Bouchat II* through *V* with Bouchat and the licensees cross-moving for summary judgment. The district court decided the summary judgment motions in a published opinion, *Bouchat v. Champion Products, Inc.*, 327 F. Supp. 2d 537 (D. Md. 2003). First, the court held that NFLP virtually represented the licensees in *Bouchat I*. The licensees were accordingly bound by the *Bouchat I* finding that their use of the Flying B infringed Bouchat's copyright, and the district court granted partial summary judgment in favor of Bouchat on the issue of liability. *Id.* at 544. Second, the district court held that Bouchat was precluded from relitigating the issue of whether any of the licensees'

merchandising profits were attributable to the infringement of Bouchat's copyrighted work because the *Bouchat I* jury conclusively resolved that claim against him. *Id.* at 545-46. Third, the district court rejected Bouchat's argument that he is entitled to an award of statutory damages from each of the licensees who used the infringing Flying B. Specifically, the court ruled that the judgment in *Bouchat I* precluded Bouchat from obtaining any statutory damages in the later litigation. *Id.* at 549. The court reasoned in the alternative that even if judge-made preclusion doctrines did not prohibit statutory damages, Bouchat did not qualify for such damages because he did not register his copyright before the infringing conduct began. *Id.* at 552. Based on these determinations, the district court entered judgment in favor of Bouchat on liability, but denied him monetary recovery in each of the four related cases, *Bouchat II*, *III*, *IV*, and *V*. Bouchat now appeals the judgments insofar as they deny damages. We review grants of summary judgment *de novo*. *Murrell v. Ocean Mecca Motel, Inc.*, 262 F.3d 253, 256 (4th Cir. 2001)[2]

## II.

A copyright owner in a civil infringement action may elect one of two types of damages: (1) actual damages and "any additional profits of the infringer" or (2) statutory damages. 17 U.S.C. § 504(a). The election is made "at any time before final judgment is rendered." *Id.* § 504(c)(1). Bouchat concedes that the jury verdict in *Bouchat I*'s damages phase precludes him from seeking infringement profits from the licensees in *Bouchat II*, *IV*, and *V*. His appeal therefore challenges

---

[2]The defendants in *Bouchat III* (Baltimore Ravens Limited Partnership, Baltimore Ravens Football Company, Inc., and Baltimore Stadium Company, LLC) are all closely affiliated with Baltimore Ravens, Inc., one of the defendants in *Bouchat I*. Indeed, before *Bouchat III* was filed, Baltimore Ravens, Inc. and the stadium company transferred all of their assets to the limited partnership in exchange for partnership shares; the football company was merged into Baltimore Ravens, Inc. and ceased to exist. Bouchat does not explain how the district court erred in determining that the claim against Baltimore Ravens, Inc. resolved in *Bouchat I* was indistinguishable from the claim against the *Bouchat III* defendants. Accordingly, we affirm the grant of summary judgment in favor of the *Bouchat III* defendants and eliminate that case from the remainder of our discussion.

the district court's determination that he is not entitled to either actual or statutory damages against the licensees.

### A.

"The copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages." 17 U.S.C. § 504(b). The district court, after concluding that Bouchat did not seek actual damages, granted the licensees summary judgment foreclosing this category of recovery in the cases before us today. *Champion Prods.*, 327 F. Supp. 2d at 545. The complaint in each case, however, includes a prayer for actual damages, and at oral argument on the summary judgment motion Bouchat contended that he is entitled to actual damages in the form of a reasonable royalty from each licensee. The district court therefore erred when it concluded that Bouchat had forfeited his claim for actual damages. As a result, we may determine whether the claim is viable. The licensees invoke the doctrine of claim preclusion, arguing that the *Bouchat I* judgment — a judgment that awarded no damages — blocks Bouchat from seeking actual damages in *Bouchat II*, *IV*, and *V*. We agree.

The related doctrines of claim preclusion and issue preclusion "relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication." *Allen v. McCurry*, 449 U.S. 90, 94 (1980). A subsequent claim is precluded when (1) the judgment in the prior action was final and on the merits; (2) the parties in the two actions are identical or in privity; and (3) the claims in the two actions are identical. *Grausz v. Englander*, 321 F.3d 467, 472 (4th Cir. 2003).

The first element (a prior final judgment on the merits) is not disputed. The final judgment in *Bouchat I*, which we affirmed on appeal, was on the merits, and the district court was empowered to render that judgment. The second element (identical parties or privies) is also not disputed. Bouchat does not appeal the district court's determination that the Ravens and NFLP virtually represented the licensees in *Bouchat I*. This determination is important to Bouchat because it prompted the district court's conclusion that the licensees were bound

by *Bouchat I*'s finding that the Ravens and NFLP infringed the copy-right, which means that NFLP's licensees were also infringers. *Champion Prods.*, 327 F. Supp. 2d at 543-44. In embracing this much of the district court's decision, Bouchat effectively concedes that the licensees were in privity with the Ravens and NFLP for claim preclusion purposes, since virtual representation is a recognized category of privity. *See Martin v. Am. Bancorporation Ret. Plan*, 407 F.3d 643, 651 (4th Cir. 2005).

Evaluation of the third element (identical claims), which is contested, calls for more extended discussion. The requirement that the claims in the first and subsequent actions be identical is met if "the new claim arises out of the same transaction or series of transactions as the claim resolved by the prior judgment." *Meekins v. United Transp. Union*, 946 F.2d 1054, 1058 (4th Cir. 1991). We have recognized that the word "transaction"

> in the claim preclusion context connotes a natural grouping or common nucleus of operative facts. Among the factors to be considered in deciding whether the facts of the current and prior claims are so woven together that they constitute a single claim are their relatedness in time, space, origin, or motivation, and whether, taken together, they form a convenient unit for trial purposes.

*Pittston Co. v. United States*, 199 F.3d 694, 704 (4th Cir. 1999) (citations and punctuation omitted).

There are several actions here — *Bouchat I* on the one hand and *Bouchat II*, *IV*, and *V* on the other — but there is only a single nucleus of operative facts, satisfying the third element of claim preclusion. In the latter actions, *Bouchat II*, *IV*, and *V*, Bouchat asserts claims against the commercial users of the Ravens logo, whether they displayed the logo in broadcast coverage of Ravens games, produced Ravens merchandise, or sold that merchandise to ordinary consumers. In *Bouchat I* Bouchat sought to hold NFLP and the Ravens accountable for these very same acts that infringed his copyright. The complaint in *Bouchat I* is clear on this point. It alleged that NFLP "licensed third parties to use the logos and trade/service marks of the Baltimore Ravens in connection with a variety of merchandise and

promotional activities directly associated" with the Ravens. Complaint at 2-3, ¶ 4, *Bouchat I*, No. MJG-97-1470 (D. Md. filed May 1, 1997). The *Bouchat I* complaint further alleged:

> Since June 5, 1996, if not before, Defendants [the Ravens and NFLP] have been reproducing, distributing, promoting and offering for sale illegal and unauthorized copies of the subject works in the form of Baltimore Ravens' logos and/or trade/service marks to promote their business enterprises . . . . Defendants have licensed the use of the subject works . . . to third parties for the sale and merchandising of products and thereby have derived profits from the use of the subject works.

*Id.* at 7, ¶ 11. While *Bouchat I* focused on the licensor's conduct, and *Bouchat II*, *IV*, and *V* shift the focus to the licensees' conduct, the same violations of Bouchat's copyright are described throughout all of the complaints. Though the several cases before us today are sequels in which the licensees who had only a bit part in the first installment now take center stage, there is still only one interwoven story.

That Bouchat did not seek actual damages in *Bouchat I* but now seeks such damages from the licensees does not alter our conclusion that the claims in Bouchat's cases are identical. The relief Bouchat seeks for the licensees' commercial use of the infringing logo is "woven together," *Pittston*, 199 F.3d at 704, with the relief he sought against the *Bouchat I* defendants. While Bouchat's reasons for not presenting any evidence of actual damages and focusing on infringement profits in *Bouchat I* may have been perfectly sound, that is of no moment here. *Cf. Bouchat I*, 346 F.3d at 527 n.1 (Widener, J., dissenting) (explaining why "it is likely that Bouchat's actual damages, if any, were nominal."). In seeking infringement profits against the Ravens and NFLP, Bouchat asserted a right to recovery under § 504(a)(1), which makes the copyright infringer "liable for . . . the copyright owner's actual damages *and* any additional profits of the infringer." 17 U.S.C. § 504(a)(1) (emphasis added). Bouchat had his day in court on his § 504(a)(1) claim against the Ravens and NFLP in *Bouchat I*, so he could not seek actual damages against them in some later action. In *Bouchat II*, *IV*, and *V* he chose a new road and

elected actual damages against NFLP's licensees. But § 504(a)(1) links actual damages (which Bouchat never sought before) to infringement profits (which he did seek before). Section 504(b) further suggests that actual damages and infringer profits are related although distinct measures of recovery. By the statute's plain terms, recoverable infringement profits are "any profits of the infringer that are attributable to the infringement *and are not taken into account in computing the actual damages*." *Id.* § 504(b) (emphasis added). In deciding what profits the infringer must disgorge, a court must exclude certain amounts calculated as actual damages to avoid double counting. *Robert R. Jones Assocs. v. Nino Homes*, 858 F.2d 274, 281 (6th Cir. 1988); 3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 14.01[A] (1994). Thus, evaluation of infringement profits must take into account the nature of any actual damages. This link between the remedies Bouchat has sought reinforces our identification of a "common nucleus of operative facts" in these cases.

As we have explained, *Bouchat I* and *Bouchat II*, *IV*, and *V* all arise from a common series of transactions, so the claims are identical. The three requirements of claim preclusion are therefore satisfied. Accordingly, the district court correctly granted judgment in favor of the licensees because Bouchat is precluded from obtaining actual damages against them.

We do not suggest that Bouchat was legally obligated to join the licensees as defendants in the first action. In other words, we do not create a rule of mandatory joinder, for it remains settled that a copyright holder may exercise discretion in suing as many co-infringers as he chooses. *Salton, Inc. v. Philips Domestic Appliances & Pers. Care, B.V.*, 391 F.3d 871, 877 (7th Cir. 2004); *Robbins Music Corp. v. Alamo Music, Inc.*, 119 F. Supp. 29, 31 (S.D.N.Y. 1954). It is equally well established, however, that when an injured person sues joint tortfeasors in successive actions, preclusion principles determine the effect of the first judgment on the later actions. Restatement (Second) of Torts § 884 (1979). This rule invites the application of conventional preclusion doctrines in *Bouchat II*, *IV*, and *V* because of the relationship between NFLP and the licensees, who used the logo with NFLP's authorization. Each time a licensee copied the Flying B, Bouchat's copyright was infringed, and two parties were responsible: the licensee who made the copy and NFLP who authorized the

licensee to copy the logo. Because NFLP and the licensee were at fault together for the licensee's violation, they are liable jointly and severally for any damages the violation caused. *See Salton*, 391 F.3d at 877 ("[T]he principle of joint and several liability . . . governs . . . the federal statutory tort of copyright infringement") (citations omitted). Any plaintiff who sues joint tortfeasors separately bears the risk that an adverse determination in the first action will trigger preclusion doctrines in a later action. Bouchat bore this risk from the time he filed his first action, suing only the Ravens and NFLP. He made this choice, and we have no reason to insulate him from the unfavorable consequences.

B.

Bouchat argues in the alternative that the district court erred in holding that he is not entitled to statutory damages. A copyright owner may be able to choose statutory damages instead of actual damages and infringement profits. When this option is available, the Copyright Act allows

> an award of statutory damages for all infringements involved in the action, with respect to any one work, for which any one infringer is liable individually, or for which any two or more infringers are liable jointly and severally, in a sum of not less than $750 or more than $30,000 as the court considers just.

17 U.S.C. § 504(c)(1). Not every copyright owner is eligible to seek statutory damages. The Act provides that "no award of statutory damages . . . as provided by section[ ] 504 . . . shall be made for (1) any infringement of copyright in an unpublished work commenced before the effective date of its registration." *Id.* § 412.

The registration requirement is important to the statutory scheme. A person registers by filing a form with the U.S. Copyright Office. Registration promotes orderly resolution of copyright disputes because it creates a permanent record of the protected work, putting the world on constructive notice of the copyright owner's claim. *Johnson v. Jones*, 149 F.3d 494, 505 (6th Cir. 1998). While the predecessor statute did not allow any relief for copyright violations that

occurred before registration and publication, *id.*, the 1976 Act reversed that. Now

> a copyright owner whose work has been infringed before registration [is] entitled to the remedies ordinarily available in infringement cases: an injunction on terms the court considers fair, and his actual damages plus any applicable profits not used as a measure of damages. However, section 412 [denies] any award of the special or 'extraordinary' remed[y] of statutory damages . . . where infringement of copyright in an unpublished work began before registration.

H.R. Rep. No. 94-1476, at 158 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5774. By making registration a precondition for the "extraordinary remed[y]" of statutory damages, Congress sought to motivate speedy registration. *Johnson*, 149 F.3d at 505.

Bouchat registered his copyright on July 25, 1996. NFLP's infringement began the month before, in June 1996. Consequently, NFLP was not individually liable to Bouchat for statutory damages. We confirmed this when we affirmed the judgment in the second phase of *Bouchat I*, *see* 346 F.3d at 517 n.2, and the reasons were apparent from the record. For example, the *Bouchat I* complaint alleged that "[s]ince June 5, 1996, if not before, Defendants have been reproducing, distributing, promoting and offering for sale illegal and unauthorized copies of the subject works in the form of Baltimore Ravens' logos." Complaint at 7, ¶ 11, *Bouchat I*, No. MJG-97-1470 (D. Md. filed May 1, 1997). Bouchat's own expert witness, after reviewing NFLP's documents, concluded that NFLP's use of the logo generated over $2.6 million in gross revenue "from June 1996 through March 31, 1999." *Bouchat I*, 346 F.3d 514 (4th Cir. 2003) (No. 02-1999), Joint Appendix at 1260. Today Bouchat argues that the date of NFLP's first infringement was never conclusively resolved in *Bouchat I*. He now contends that his copyright was first infringed when NFLP failed within a reasonable time to give him the autographed helmet and recognition he requested in exchange for use of his drawing. But there has never before been any disagreement about the fact that NFLP infringed in June 1996 when it and the Ravens first unveiled the Flying B, and it is too late now for Bouchat to raise the issue.

Although NFLP violated the copyright for the first time in June 1996 (when it first exhibited the Flying B to the public and authorized Ravens merchandise), NFLP may have continued to violate the copyright long after July 25, 1996, when Bouchat registered. The post-registration activities make no difference. In using the word "commenced," § 412(1) instructs us to trace NFLP's infringing conduct after registration back to NFLP's original infringement in June 1996. In other words, "infringement 'commences' for the purposes of § 412 when the first act in a series of acts constituting continuing infringement occurs." *Johnson*, 149 F.3d at 506. This interpretation makes sense "because 'it would be peculiar if not inaccurate to use the word "commenced" to describe a single act' rather than the first in a group of acts." *Id.* (quoting *Singh v. Famous Overseas, Inc.*, 680 F. Supp. 533, 535 (E.D.N.Y. 1988)); *accord Mason v. Montgomery Data, Inc.*, 967 F.2d 135, 144 (5th Cir. 1992); *Johnson v. Univ. of Va.*, 606 F. Supp. 321, 325 (W.D. Va. 1985). Because NFLP's first infringement preceded Bouchat's registration, Bouchat could not pursue statutory damages against NFLP.

NFLP's battalion of licensees — not NFLP itself — are the defendants in the cases before us today. Nevertheless, the district court held that the date on which NFLP first infringed was the date on which the infringement by the licensees commenced because NFLP approved all of the licensees' infringing acts. *Champion Prods.*, 327 F. Supp. 2d at 551-52. Bouchat argues that the correct approach would have been to treat the date on which each individual licensee first violated Bouchat's copyright as the date that licensee's infringement commenced under § 412(1). We disagree.

Section 412 cannot be read in isolation. That section, which defines the registration prerequisite for statutory damages awards, must be read in harmony with § 504, which allows statutory damages "for all infringements involved in the action . . . for which any one infringer is liable individually, or for which any two or more infringers are liable jointly and severally." 17 U.S.C. § 504(c)(1). An infringer is "[a]nyone who violates any of the exclusive rights of the copyright owner" granted by the Copyright Act. *Id.* § 501(a). When a licensee copied the Flying B onto Ravens merchandise, the licensee became an infringer. NFLP gave each licensee permission to copy, so NFLP

was also responsible for the licensee's acts of copying, making NFLP jointly and severally liable for the infringing acts of each licensee.

Again, in an action against NFLP as "one infringer . . . liable individually," *id.* § 504(c)(1), we would trace post-registration infringing conduct back to pre-registration conduct in violation of the same copyright. When each licensee is paired with NFLP, the licensor-licensee pair constitutes "two . . . infringers . . . liable jointly and severally." *Id.* Because the statute does not distinguish between "one infringer . . . liable individually" and "two or more infringers . . . liable jointly and severally," *id.*, we must treat these two categories of infringers identically when assessing their statutory damages liability. The statute thus subjects a licensor-licensee pair to the same tracing rule that would apply to either one as an individually liable infringer. Here, then, we must trace the licensee's post-registration infringing conduct back to NFLP's pre-registration conduct and thereby deny statutory damages to Bouchat.

Of course, NFLP is not a party in today's cases, and none of the licensees appear responsible for NFLP's initial act of infringement since none aided in designing the Flying B. But these factors do not change the analysis. Section 504(c)(1) speaks of "infringers," not parties. Because a statutory damages award covers "all infringements involved in the action . . . for which" infringers are liable, *id.* (emphasis added), it is appropriate to treat the earliest date of infringement by *any* participant in a line of related copyright violations as the date of commencement. Focusing on NFLP's conduct here is entirely logical. Once NFLP designed and licensed the Flying B logo that infringed Bouchat's copyright, the liability of all of NFLP's licensees became a foregone conclusion. Thus, we hold that a copyright owner may not obtain statutory damages from a licensee liable jointly and severally with a licensor when the licensor's first infringing act occurred before registration and was part of the same line of related infringements that included the licensee's offending act.

The following hypothetical illustrates our holding. Suppose that in January 1997, several months after Bouchat registered his copyright, a sweatshirt manufacturer, M Corp., printed a batch of Ravens sweatshirts bearing the Flying B pursuant to an NFLP license. Production of the sweatshirts violated Bouchat's exclusive right to "re-

produce the copyrighted work in copies," 17 U.S.C. § 106(1), and was thus an infringement. NFLP's authorization of M Corp.'s use of the Ravens logo gave rise to M Corp.'s act, making NFLP and M Corp. jointly and severally liable for the infringement. But NFLP began public display and commercial distribution of the offending logo before Bouchat's registration. As a result, "the first act in a series of acts constituting continuing infringement," *Johnson*, 149 F.3d at 506, would be the first display and distribution by NFLP in June 1996, before Bouchat's registration. Bouchat would be entitled in this hypothetical to injunctive relief, actual damages, and infringement profits against M Corp. and NFLP. Statutory damages, however, would not be an option because the continuing infringement commenced before registration.

Our holding flows from the statute's plain language. Moreover, our holding has the added benefit of respecting Congress's purpose for enacting § 412, which is to encourage speedy registration. If we ignored this purpose and construed the Copyright Act to allow Bouchat to obtain the "extraordinary remed[y]" of statutory damages for acts that occurred long after he registered his copyright, we would discourage rather than promote swift registration of creative works. *See* H.R. Rep. No. 94-1476 at 158. In sum, we conclude that the district court correctly awarded the licensees a summary judgment denying Bouchat's claim for statutory damages.

### III.

For the foregoing reasons, we affirm the judgments in *Bouchat II*, *III*, *IV*, and *V* that deny Bouchat's requests under the Copyright Act for actual or statutory damages.

*AFFIRMED*

NIEMEYER, Circuit Judge, concurring:

I concur in the good opinion of my colleague writing for the court, recognizing that Bouchat, in seeking to avail himself of his victory in *Bouchat I*, has conceded that the downstream defendants he has named in the related cases before us are in privity with the defendants

in *Bouchat I*. Therefore, the downstream defendants benefit from the preclusive effects of *Bouchat I* insofar as Bouchat has pursued the same claims against them as privies. And we now hold that he has, because the same transaction and occurrence underlies all Bouchat's lawsuits.

But absent Bouchat's concession, made for understandable strategic reasons, we would face almost irresolvable issues presented by this multi-party licensing infringement case. While the Copyright Act addresses adequately the single infringement of a work, it is not susceptible to a straightforward application when multiple infringements by multiple parties arise from a single work.

The Copyright Act strives to be complete and comprehensive by creating causes of action at the subatomic level. Yet in doing so, the Act loses focus on the bigger picture. In granting an author a separate "exclusive right" in every reproduction, derivative preparation, distribution, performance, display, and digital audio transmission of his work, *see* 17 U.S.C. § 106, the Act gives the author a right to institute an action for each infringement of each exclusive right, *see id.* § 501. The enforcement rights are further sub-atomized by the Act's definition of distribution as any sale or other transfer of ownership, rental, lease, or lending. *See id.* § 106(3). And with respect to each infringement, the owner may receive actual damages or disgorgement of profits or, by election made "any time before judgment, statutory damages of not less than $750 or more than $30,000 as the court considers just." *Id.* § 504. The Act provides for a separate statutory damage award "for all infringements involved in the action, with respect to any one work." *Id.* § 504(c).

Thus, when the "Village Book Store" sells a copy of a book containing a photograph that infringes on a photographer's work, the photographer has a cause of action against the book store. And if the photographer so elects, he may claim, in lieu of actual damages, statutory damages of "not less than $750 or more than $30,000 as the court considers just." *Id.* § 504(c)(1). When one million copies of the book are sold, it appears that the photographer may elect to file separate action after separate action against every book store every time the store violates one of the photographer's § 106 rights. I question whether Congress intended conceptually to provide for an award to

the photographer of at least $750,000,000, that is, $750 for each of the million copies sold. Regardless of the answer to that question, the Act undoubtedly encourages multiple, separate infringement actions because a statutory damage award is available *in each action* for "all infringements involved *in the action*" with respect to any one work. *Id.* (emphasis added); *see also* 4 *Nimmer on Copyright* § 14.04[E][2].

Relying on § 501(b) of the Act, the first book store might be able to join the infringing book's author, publisher, and distributor — which certainly would include any licensees, *see* 17 U.S.C. § 101 — arguing that it was bringing into "one action" "any person hav[ing] or claim[ing] an interest in the copyright." *Id.* § 501(b). Opposing such joinder, because it would potentially frustrate his effort to receive multiple statutory awards, the photographer would assert that all of the sellers are not "jointly and severally" liable for each other's infringing sales for purposes of determining statutory damages. *See id.* § 504(c) (authorizing a statutory award "for all infringements involved in the action, with respect to any one work, for which any one infringer is liable individually, or for which any two or more infringers are liable *jointly and severally*").

A crowning layer of complexity is added if the photographer files first against the publisher and elects to seek actual damages and thereafter sues the book stores, seeking statutory damages. The Act would seem to limit the photographer only by requiring that he make his election of remedies in the specific action "at any time before final judgment is rendered." *See id.* § 504(c). A question of claim preclusion might be raised, but its application would depend on whether there was privity among the parties. Moreover, if the book stores were thought to be in privity with the publisher, the photographer could simply sue each of the book stores for statutory damages *before* suing the publisher for actual damages or disgorgement of profits.

Even as the Copyright Act seems to encourage claim splitting and manipulation of the litigation process, federal judicial policy encourages resolving in one action all claims arising out of a transaction or occurrence. *See, e.g.*, Fed. R. Civ. P. 13, 14, 18, 19, & 20.

These questions, I believe, demonstrate that the Copyright Act pulls in tension from traditional joinder and claim preclusion policies

and tends to undermine good judicial administration aimed at efficiency and justice. As a consequence, this case easily could have presented the fundamental but difficult issue whether a copyright owner *must* join all related infringers — from the original copier to the downstream licensees — in a single infringement action, or whether he has the prerogative to proceed piecemeal against the gamut of infringers. Today, however, we do not resolve these nettlesome issues because of the peculiar circumstances created by Bouchat's desire to leverage his win in *Bouchat I* into a claim for statutory damages in the cases before us now. Yet these issues will arise with increasing frequency — especially in view of advanced technology for copying and transmitting data, which facilitates massive infringements — and therefore Congress should reconsider them soon to define a more workable balance.