**Frederick E. BOUCHAT, Plaintiff**

v.

**BALTIMORE RAVENS LIMITED PARTNERSHIP, et al.,**
**Defendants.**

**Civil Action No. MJG–08–397.**

United States District Court,
D. Maryland.

Nov. 21, 2008.

See also 346 F.3d 514 and 506 F.3d 315

Howard J. Schulman, Daniel P. Doty, Schulman and Kaufman LLC, Baltimore, MD, for Plaintiff.

Mark D. Gately, Hogan and Hartson LLP, Baltimore, MD, Robert Lloyd Raskopf, Quinn Emanuel Urquhart Oliver and Hedges LLP, New York, NY, for Defendants.

## DECISION

MARVIN J. GARBIS, District Judge.

This case is the most recent in a series of actions brought by Plaintiff Frederick E. Bouchat ("Bouchat") for infringement of his copyright in his artwork ("the Shield Drawing").

The Shield Drawing was copied and used as the basis for the primary symbol identifying the Baltimore Ravens football team during its first three seasons ("the Flying B Logo").

This case was submitted to the Court for bench trial decision[1] upon the record.[2] The Court held a hearing and had the presented in prior litigation between the parties and matters of which the Court could take judicial notice.

1. See Hearing Tr. 5–8, August 13, 2008.

2. Consisting of the parties' respective submissions of evidence in the instant case, matters

benefit of the argument of counsel. The Court now issues this Memorandum of Decision as its findings of fact and conclusions of law in compliance with Rule 52(a) of the Federal Rules of Civil Procedure.

## I. BACKGROUND

In prior litigation in this Court, Bouchat established that the NFL[3] and Ravens[4] infringed his copyright in the Shield Drawing but was unable to recover any monetary damages for the infringement. *See Bouchat v. Baltimore Ravens, Inc.,* 241 F.3d 350 (4th Cir.2001), *Bouchat v. Baltimore Ravens, Inc.,* 215 F.Supp.2d 611 (D.Md.2002), *Bouchat v. Baltimore Ravens, Inc.,* 346 F.3d 514 (4th Cir.2003), *Bouchat v. Champion Products, Inc., et al.,* 327 F.Supp.2d 537 (D.Md.2003), *Bouchat v. The Bon–Ton Dept. Stores, Inc. et al.,* 506 F.3d 315 (4th Cir.2007).

As discussed herein, the NFL and Ravens seek to continue to display pictures and memorabilia of the 1996–98 seasons on which the Flying B logo is visible. Bouchat seeks an injunction that would prevent these displays.

It is appropriate to begin the discussion by placing the origin of the litigation—the creation of the artwork at issue—in historical context.

### A. Baltimore's Professional Football Teams

In 1920, a group of football teams from across the state of Ohio—loosely referred to as the "Ohio League"—formalized the American Football Association that became the National Football League. The

3. The term "NFL" is used herein to refer to the National Football League as well as all affiliated entities, including NFL Properties, Inc., NFL Films, Inc., and NFL Productions LLC d/b/a NFL Films.

4. The term "Ravens" is used herein to refer all entities that have owned the Baltimore

Baltimore Colts can be viewed[5] as a descendent of one of the original NFL teams.

### 1. The First Baltimore Colts (1947–52)

In 1946, teams from eight cities (excluding Baltimore), formed the All American Football Conference (AAFC) to compete with the NFL. After the first AAFC season, the Miami Seahawks

moved to Baltimore and became the first Baltimore Colts.

After the 1949 season, the AAFC disbanded and three of its teams, the Baltimore Colts, the Cleveland Browns, and the San Francisco 49'ers joined the NFL. The original Baltimore Colts folded after the 1950 season. However, after the team left, the band played on until Baltimore, again, obtained an NFL team.

### 2. The Second Baltimore Colts (1953–84)

One of the eight teams that formed the NFL in 1920 was the Dayton Triangles.

Ravens NFL Football Team, including the Baltimore Ravens Limited Partnership and Baltimore Ravens, Inc.

5. Although, some NFL "historians" dispute the lineage.

In 1930, the Triangles team moved to Brooklyn, New York and changed its name to the Brooklyn Tigers.

In 1945 the Brooklyn Tigers merged into the Boston Yanks.

The Boston Yanks moved to New York and became the New York Bulldogs in 1949.

The team became the New York Yanks in 1950 and, in 1952, moved to Dallas and became the Texans.

The Texans did not succeed in Dallas and, in 1953, moved to Baltimore and became the second team known as the Baltimore Colts.

The Baltimore Colts played, in Baltimore for thirty seasons, 1953 through 1983. As noted by Judge Posner of the United States Court of Appeals for the Seventh Circuit:

> [The Baltimore Colts] became one of the most illustrious teams in the history of professional football. In 1984, the

team's owner, with the permission of the NFL, moved the team to Indianapolis, and it was renamed the "Indianapolis Colts." The move, "sudden and secretive, outraged the citizens of Baltimore." *Indianapolis Colts, Inc. v. Metro. Baltimore Football Club P'ship,* 34 F.3d 410, 411 (7th Cir.1994) ("the CFL Case").

Thus, for the second time, Baltimore lost its beloved Colts. However, by virtue of a peculiar provision in the team owner's divorce proceedings, the band was allowed to continue to operate, in Baltimore, as the "Baltimore Colts Marching Band." So, once again, the band played on and kept alive the dream of an NFL team in the city.

### 3. *The Twelve Year Gap (1984–96)*

Following the departure of the Colts, there were substantial efforts to bring professional football back to Baltimore.

In 1985, the Philadelphia team of the United States Football League became the Baltimore Stars.

The Stars played in Maryland[6] for one season until the league folded in 1986.

There were unsuccessful efforts to obtain an NFL expansion team. For example, the less than politically correct named Baltimore Bombers never got off the ground.

In 1993, the Canadian Football League ("CFL") "invaded" the United States and awarded a franchise to Baltimore. The team, in response to local popular demand, was originally named the "Baltimore Colts." However, once "the NFL got wind of the name and threatened legal action" the name was changed to "Baltimore CFL Colts". *Indianapolis Colts, Inc.,* 34 F.3d at 411. The insertion of the letters "CFL" was not sufficient.

As stated by Judge Posner in the CFL case:

> In 1952, the National Football League permitted one of its teams, the Dallas Texans, which was bankrupt, to move to Baltimore, where it was renamed the "Baltimore Colts." Under that name it became one of the most illustrious teams in the history of professional football.

*Id.* at 411.

\* \* \*

> Certainly *the* Baltimore Colts had a national following, and we do not doubt that the resonance of the name, and not merely the clamor of the Baltimoreans, motivated the Baltimore team's choice of "Colts," out of all the appealing animals in the ark.

*Id.* at 412 (emphasis in original).

The CFL team, enjoined from any use of the name "Colts," started its first (1994) season without a name and then, presum-

---

**6.** The team played in College Park because Baltimore's Memorial Stadium was not avail-
able.

ably seeking to get a name as close as possible to the forbidden equine predecessor, became the Baltimore Stallions.

The Stallions were highly successful at the box office and on the football field, winning the Grey Cup—the Super Bowl of the Canadian Football League—in 1995. However, when the NFL returned to Baltimore, the Stallions were expatriated to Canada and became the Montreal Alouettes.

### 4. *The Return of the NFL*

In November of 1995, the owner of the Cleveland Browns decided to move the team to Baltimore. However, as part of an agreement relating to the move, the owner left the team's name, color scheme, "history", etc., in Cleveland to be acquired by an expansion team replacing the old Browns team.

Thus, by December of 1995, Baltimore, again, had an NFL football team albeit one yet to be named.

### B. *The Raven's "Flying B Logo" (1996–98)*

In 1995, Plaintiff Frederick E. Bouchat ("Bouchat") was employed as a security guard at a State Office building in Baltimore, Maryland. Bouchat was an amateur artist who drew pictures often inspired by comic books.

Bouchat was a rabid football fan and highly excited by the announcement, in November of 1995, that the Cleveland Browns team was moving to Baltimore and would be selecting a new name.

Bouchat was inspired to draw a series of logos for the new Baltimore football team, using names that had been discussed in the local media. These included, among others, "Jockeys," "Americans," "Marauders" and, Bouchat's favorite, "Ravens[7]." Bouchat drew a veritable "portfolio" of possible Ravens logos, including what has been referred to in the course of the litigation as the "Shield Drawing."

In December of 1995, Bouchat posted the Shield Drawing at the guard station in the entrance of the building in which he worked. The picture was visible to persons entering and leaving the premises. He also gave copies of the Shield Drawing as Christmas gifts in December of 1995. Because of Bouchat, the name "Ravens" became a potential identification for the new football team, at least among the persons working in the building in which he worked.

In March of 1996, the NFL and the team announced that the team would be named "the Ravens." The head of a state agency housed in the building in which Bouchat worked arranged for Bouchat to have a "photo-op" with the head of the Maryland Stadium Authority for publica-

7. In honor of Edgar Allen Poe's, "The Raven." Poe, who spent the last part of his life in Baltimore, is considered an honorary Baltimorean.

tion in an employee newspaper. A photograph of Bouchat, holding a miniature helmet with one of his Raven logos—but not the Shield Drawing—and the head of the Maryland Stadium Authority was, in fact published.

In early April 1996, Bouchat faxed the Shield Drawing to the Stadium Authority office, addressed to the Chairman asking him to send the sketch to the President of the Ravens. Bouchat included a note stating: "If he would like this design if he does use it I would like a letter of recognition and if the team wants to I would like a adiograph (*sic*) [autographed] helmet."

Through a series of misunderstandings, Bouchat's Shield Drawing was sent to the Stadium Authority Chairman's law office, forwarded to the Ravens' temporary headquarters, forwarded to the NFL in New York and then to the commercial artists working on the Ravens project. There is no reason to believe that the Ravens or NFL intentionally caused the Shield Drawing to be provided to the artists. Nevertheless, the Shield Drawing was provided to the artists who used Bouchat's drawing as the basis for the "Flying B Logo."

The NFL and Ravens, believing that the Flying B Logo had been developed as a completely original work, used the logo as the teams's primary identification symbol.

The first public use of the Flying B Logo took place in June of 1996 when the Ravens team uniforms were displayed in Baltimore. At this time, Bouchat first became aware that the NFL and the Ravens had copied his Shield Drawing without permission. Thereafter, Bouchat consulted counsel and, in August of 1996, registered his copyright in the Shield Drawing with the United States Patent and Trademark Office.

### C. Litigation Background

In May of 1997, Bouchat filed *Bouchat v. Baltimore Ravens, et al.*, MJG–97–1470, asserting infringement of his copyright in the Shield Drawing.[8] This Court bifurcated the case and conducted a first trial of liability issues. The jury found that the NFL and Ravens had infringed Bouchat's copyright in the Shield Drawing. On interlocutory appeal, the United States Court of Appeals for the Fourth Circuit affirmed. *Bouchat v. Baltimore Ravens, et al.*, Case No. 99–1617.

In the damages phase, Bouchat proceeded to trial on his claim of entitlement to the profits of the infringers.[9] The jury found that there had been no profit attributable to the infringement of Bouchat's copyrighted work. Accordingly, judgment was entered holding that the defendants had infringed Bouchat's copyright in the Shield Drawing but that Bouchat was entitled to recover no damages. The judgment was affirmed on appeal. *Bouchat v. Baltimore Ravens Football Club, Inc. et al.*, 346 F.3d 514 (4th Cir.2003), *cert. denied*, 541 U.S. 1042, 124 S.Ct. 2171, 158 L.Ed.2d 732 (2004).

Bouchat also filed suits against several hundred NFL licensees who sold merchan-

---

8. Bouchat also, unsuccessfully, alleged infringement of his copyright in certain other drawings.

9. Bouchat did not seek actual damages and could not seek statutory damages because the infringement had occurred prior to his registration of the copyright.

dise bearing the Flying B Logo. *Bouchat v. Champion Prod., Inc., et al.,* Case No. MJG–99–1576, *Bouchat v. K–Mart Corp., et al.,* Case No. MJG–01–1996; *Bouchat v. 7–Eleven,* Case No. 03–2229. In these cases, this Court entered judgment holding that the Defendants' use of the Baltimore Ravens "Flying B Logo" infringed Bouchat's copyright rights in the Shield Drawing, but awarded Bouchat no monetary recovery. These judgments were affirmed. *Bouchat v. The Bon–Ton Dept. Stores, Inc., et al.,* Case No. 03–2173; *Bouchat v. Champion Products, Inc., et al.,* Case No. 03–2174; *Bouchat v. Baltimore Ravens, et al.,* Case No. 03–2389; *Bouchat v. 7–Eleven,* Case No. 04–1008.

## II. DISCUSSION

### A. Defendant's Current Use of the Logo

It is undisputed that the NFL and Baltimore Ravens have made, and wish to continue to make what they characterize as "historical" use of depictions of the Flying B Logo.

These uses include:

1. The sale of Ravens' and other teams' highlight films of the 1996–98 season in which Ravens players wearing uniforms on which the Flying B Logo can be seen.

2. Showing at Ravens (and other teams') football games, action film clips from the Ravens' 1996–98 seasons in which the Flying B Logo can be seen on player's uniforms.

3. Public displays of memorabilia of the 1996–98 seasons, for example a sheet of tickets from the Raven's

inaugural season (1996) on which the Flying B Logo was printed.

4. Public displays of 1996–98 photographs of retired players wearing uniforms on which the Flying B Logo is visible.

In this action, Bouchat seeks an injunction prohibiting all such uses together with an order providing for the destruction of all such items on which the Flying B Logo is visible.

The Defendants contend that they have made, and only intend to make, permissible fair use of Bouchat's copyright protected work.[10]

### B. The Fair Use Doctrine

Section 107 of the Copyright Act provides, in pertinent part:

Notwithstanding the provisions of 106 and 106A [giving a copyright owner exclusive rights], the fair use of a copyrighted work ... is not an infringement of copyright.

\* \* \*

In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include-

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

---

10. Defendants also assert what may be referred to as "procedural" defenses. It suffices, in the present context, to note that this Court does not agree with Defendants that Bouchat would be procedurally prevented from obtaining the relief sought herein if the Defendants' use of the Flying B Logo were not held to be fair use under the Copyright Act.

(4) the effect of the use upon the potential market for or value of the copyrighted work.

*Id.*

■ The four fair-use factors are not applied mechanistically or in isolation. "All are to be explored, and the results weighed together, in light of the purposes of copyright." *Sundeman v. Seajay Soc'y, Inc.*, 142 F.3d 194, 202 (4th Cir.1998)(quoting *Campbell v. Acuff–Rose Music, Inc.*, 510 U.S. 569, 578, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994)). As the Fourth Circuit elaborated in 2003:

> These factors are "not meant to be exclusive," *Harper & Row*, 471 U.S. at 560, 105 S.Ct. 2218, but rather "illustrative," representing "only general guidance about the sorts of copying the courts and Congress most commonly have found to be fair uses." *Campbell*, 510 U.S. at 577–78, 114 S.Ct. 1164. Because a particular use must be examined for its reasonableness in determining whether it is a "fair use," any per se rule is inappropriate. *Id.* at 577, 114 S.Ct. 1164. (internal citations omitted).

*Bond v. Blum*, 317 F.3d 385, 394 (4th Cir.2003)

■ The fair use doctrine calls for a "case-by-case analysis." *Campbell v. Acuff–Rose Music, Inc.*, 510 U.S. 569, 577, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994). Courts must consider and weigh all four factors. *Id.*

### C. Consideration of the Fair Use Factors

As noted above, in determining whether there is fair use under the Copyright Act, the Court must consider:

- The purpose and character of the use.
- The nature of the work.
- The amount and substantiality of the use.
- The effect of the use on the potential market.

### 1. The Purpose and Character of the Use

■ The Court finds that the uses at issue have an essentially historical purpose and character.

The display of pictures or artifacts from the 1996–98 season in the context of a presentation of a team's history is analogous to the inclusion of pictures of copyrighted posters in a book presenting a biography of a rock band (The Grateful Dead). *See Bill Graham Archives v. Dorling–Kindersley, Ltd.*, 448 F.3d 605, 609 (2d Cir.2006)(holding this to constitute fair use).

The Ravens and NFL display 1996–98 season photos of Ravens players and show action clips at football games for a primarily historical purpose.

Moreover, the visibility of the Flying B Logo on the players' uniforms is incidental to the primary purpose.

The case of *On Davis v. The Gap, Inc.*, 246 F.3d 152, 173–76 (2d Cir.2001) does not present a pertinent analogy to the instant case. In *On Davis*, the defendant clothing and accessory merchandiser published advertisements showing a model wearing the plaintiff's copyrighted non-

functional jewelry (eyewear) in addition to the defendant's products. Plaintiff's copyright protected work was included for the purpose of attractively presenting the defendant's products for sale. By no means did the *On Davis* defendant have an historical (or any other noncommercial) purpose for its use of the plaintiff's copyrighted material. Rather, the purpose was purely commercial.

The uses at issue in the instant case are not, except in the most tangential sense, commercial. Even in connection with the sale of films of past seasons, the purpose is to make available a depiction of past events as they occurred. Except for a few seconds of an approximately half hour film in which the Flying B Logo appears alone, the visibility of the logo on players' uniforms is incidental to the purpose of showing films of the 1996–98 team in action.

Thus, the Court finds that the nature and purpose of the use at issue are primarily historical with only an incidental, in context, insignificant, commercial purpose.

### 2. *The Nature of the Work*

▉ The copyright protected work at issue is a drawing. It is not the kind of work that is published with the expectation that it will be used or copied without express permission as, for example, a book of forms. Hence, the nature of the work would—absent other compelling factors— tend to indicate that making a copy would not be fair use. However, where, as here, the primary purpose of the use is historical, the nature of the work would not preclude a fair use conclusion.

### 3. *The Amount and Substantiality of the Use*

▉ The Court must consider whether "the amount and substantiality of the portion used in relation to the copyrighted work as a whole," § 107(3) . . . are reasonable in relation to the purpose of the copy-

ing. *Campbell,* 510 U.S. at 586, 114 S.Ct. 1164. In the instant case, the entirety of the copyright protected work has been used. However, as recognized in *Bill Graham,* involving depictions of copyright protected posters in their entireties, when a fair use cannot be accomplished without copying an entire work, this factor will not weigh against defendants. 448 F.3d at 613 (concluding that the transformatively different purpose of the book at issue necessitated including the copyrighted posters in their entirety).

In regard to each of the uses at issue, the Flying B Logo, although depicted in its entirety, is not a major component of the entire work in which it is used. Whether in a display of inaugural season tickets, a photo of a former player or even, as in a Ravens' highlight film—a few seconds of a half hour or so film in which the logo alone is shown—the copyright protected work is only an inconsequential portion of the overall work.

### 4. *Potential Effect on the Market*

▉ The Court must consider "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). In the Fourth Circuit, this factor "is undoubtedly the single most important element of fair use." *Sundeman,* 142 F.3d at 206 (quoting *Harper & Row,* 471 U.S. 539, 566, 105 S.Ct. 2218, 85 L.Ed.2d 588). This factor requires the Court to consider "the extent of market harm caused by the particular actions of the alleged infringer," as well as "whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market for the original." *Campbell,* 510 U.S. at 590, 114 S.Ct. 1164; *Sundeman,* 142 F.3d at 206–07.

▉ There is nothing to indicate that there is any present or foreseeable market

whatsoever for the copyright protected work. Hence, the uses in issue do not have any effect upon the potential market for, or value of, the copyrighted work.

### D. *Determination of Fair Use*

 The Court, after consideration of the pertinent factors, concludes that the uses in issue constitute fair use of Bouchat's copyright within the meaning of Section 107 of the Copyright Act.

The primarily historical and non-commercial nature of the uses and the relatively incidental use of the Flying B Logo in the context of the overall works taken together with the lack of any negative effect upon any potential market for, or the value of, the copyrighted work are determinative.

The Defendants seek a decision that would provide a definitive guide for future possible uses of the Flying B Logo. Of course, the Court is not holding that Bouchat has no enforceable copyright protection with regard to his original work, the Shield Drawing, and the Flying B Logo derived from it. The Court is holding only that the specific uses in issue, in the context presented in the instant case, constitute fair use so as not to constitute copyright infringement.

Certainly, the Court expects that its decision herein,[11] would be relied upon as guidance with respect to further uses fairly analogous to those here at issue. However, the Court cannot foreclose the possibility that there could be other uses by the Defendants that would not be fair use under Section 107 of the Copyright Act.

### III. *CONCLUSION*

For the foregoing reasons:

1. The Court finds that, in respect to the matters at issue, the Defendants' uses of Plaintiffs' copyright protected work constitute fair use under 17 U.S.C. § 107 and, therefore, do not constitute infringement of copyright.

2. Judgment shall be issued by separate Order.

---

11.  Subject, most certainly, to appellate review.