NIEMEYER, Circuit Judge,
dissenting:
When the Baltimore Ravens professional football team played its first game in franchise history on September 1, 1996, playing the Oakland Raiders, it did so at its home field, which was painted with a “Flying B Logo.” The Logo was also displayed on the helmets of the players, on tickets, on flags, and on other related items. The game, which was played before a crowd of 64,124, was televised live and recorded for posterity by NBC.
The Flying B Logo, consisting of a winged shield on which was displayed a flying “B” and the name “Ravens,” had apparently been copied from the “Shield Drawing” that had been created and submitted to the Ravens by an amateur artist, Frederick Bouchat. Bouchat’s Shield Drawing depicted a raven with its wings spread, holding in its beak a shield on which was displayed a flying “B” and the name “Ravens.”
After the Ravens’ first season, Bouchat filed a copyright action against the Ravens and the National Football League, alleging that the Flying B Logo infringed his copyright in the Shield Drawing. After a jury found infringement, the Ravens and the NFL ceased using the Flying B Logo and adopted a new logo consisting of the profile of a raven’s head with a “B” superimposed on it (the “Raven Profile Logo”), which they have used since the 1999 season. From that time on, the Raven Profile Logo has been the identifying symbol of the franchise, and the Ravens and the NFL have not used the Flying B Logo to identify the Ravens in any way. Although the Ravens and the NFL have not placed *318 the Flying B Logo on any item since 1998, it remains visible in memorabilia, photographs, and video highlights from the Ravens’ first three seasons, as part of the team’s history then recorded.
Frederick Bouchat commenced this action against the Baltimore Ravens Limited Partnership (“the Ravens”), the National Football League, and NFL Productions, LLC (collectively, “the NFL”), seeking an injunction prohibiting the sale and display of any items that include the Flying B Logo and requiring the destruction of all items on which the Logo is included. Following a bench trial, the district court found that the defendants’ purpose in displaying and selling memorabilia and game highlights from the Ravens’ first three seasons is “primarily historical” and that the display of the Flying B Logo in this context is “incidental to the [historical] purpose.” Bouchat v. Baltimore Ravens Ltd. P’ship, 587 F.Supp.2d 686, 696 (D.Md. 2008). It also found that this incidental historical use of the Flying B Logo has no negative effect on the value of, or the market for, Bouchat’s Shield Drawing. It thus concluded that the defendants’ current use of the Flying B Logo in memorabilia and game highlights does not infringe Bouchat’s copyright because it constitutes “fair use” under the Copyright Act of 1976, 17 U.S.C. § 107.
I agree with this conclusion and therefore would affirm.
I
In 1995, when the Cleveland Browns announced that they would move from Cleveland to Baltimore, Frederick Bouc-hat, an amateur artist working as a security guard at a state office building in Baltimore, began drawing a series of logos for the potential mascots that were being mentioned in the media. One of these logos was the Shield Drawing.
In April 1996, after the “Ravens” name had been selected, Bouchat faxed a copy of the Shield Drawing to the office of the Maryland Stadium Authority, asking the chairman of the Stadium Authority to send the drawing to the president of the Ravens. Bouchat included a note stating, “If he would like this design if he does use it I would like a letter of recognition and if the team wants to I would like an [autographed] helmet.”
As the district court found, “Through a series of misunderstandings, Bouchat’s Shield drawing was sent to the Stadium Authority Chairman’s law office, forwarded to the Ravens’ temporary headquarters, forwarded to the NFL in New York and then to the commercial artists working on the Ravens project. There is no reason to believe that the Ravens or NFL intentionally caused the Shield drawing to be provided to the artists.” Bouchat, 587 F.Supp.2d at 693. Nonetheless, the artists used the drawing as the basis for the Flying B Logo that was adopted and used by the Ravens to identify the franchise. The Logo was displayed on the football field, on the players’ helmets, on tickets, and on other items related to the franchise.
When the Ravens’ uniform was first unveiled in Baltimore in June 1996, Bouchat noticed the striking similarities between his Shield Drawing and the Flying B Logo. Concerned that the Ravens and the NFL had appropriated his Shield Drawing without permission, Bouchat sought legal counsel and, in August 1996, registered the Shield Drawing with the United States Patent and Trademark Office. He did not, however, register any objection with the Ravens or the NFL, and the team played its first season, using the Flying B Logo, unaware of Bouchat’s concern.
*319 In May 1997, after the Ravens’ first full season, Bouchat commenced an action against the Ravens and the NFL for copyright infringement, seeking only damages. Bouchat v. Baltimore Ravens, Inc., No. MJG-97-1470 (D.Md.). He did not request any injunctive relief. In November 1998, a jury returned a verdict finding that the Flying B Logo infringed Bouchat’s copyright in the Shield Drawing. Even though the Ravens and the NFL filed an interlocutory appeal from the verdict — ie., before damages were considered — they immediately ceased using the Flying B Logo and adopted, instead, the Raven Profile Logo to identify the franchise.
Since the beginning of the 1999 season, the Ravens and the NFL have continuously used the Raven Profile Logo. But while the Ravens and the NFL have not identified the Ravens’ franchise with the Flying B Logo since 1998, the Logo has not completely disappeared, as it can still be seen on all visual depictions of players’ uniforms, tickets, and other memorabilia from the 1996-98 seasons.
After the Ravens and the NFL made the change in the Ravens’ identifying logo, the parties completed the copyright-infringement litigation, trying the issue of damages. Bouchat claimed entitlement to the portion of the Ravens’ and the NFL’s profits attributable to the infringing Flying B Logo, but the jury found that no profit had been realized from use of the Logo and denied Bouchat damages.
In this action, Bouchat now seeks, for the first time, to enjoin the Ravens and the NFL from using or displaying the Flying B Logo in any way and in any place. He objects, in particular, to the fact that at its headquarters, as part of a tribute to the history of the franchise, the Ravens display memorabilia and photographs from its first three seasons in which the Flying B Logo is visible. He also objects to the showing and selling of game highlights from the first three seasons — 1996, 1997, and 1998. The injunction that Bouchat seeks would prevent the Ravens and the NFL from displaying the Flying B Logo in any way and for any purpose and would require the defendants to deliver for destruction any item that contains the Logo, including game highlights of other NFL teams when playing the Ravens during the 1996-98 seasons.
Following a bench trial, the district court concluded that the Ravens and the NFL’s current use of the Flying B Logo does not infringe Bouchat’s copyright in the Shield Drawing because such use constitutes “fair use” under 17 U.S.C. § 107. The court found that the defendants’ use of the Flying B Logo in displaying memorabilia and showing and selling game highlights from the Ravens’ first three seasons is for “an essentially historical purpose.” Bouchat, 587 F.Supp.2d at 695. It noted that “the visibility of the logo on players’ uniforms is incidental to the purpose of showing films of the 1996-98 team in action.” Id. at 696. It also found that “the nature and purpose of the use at issue are primarily historical with only an incidental, in context, insignificant, commercial purpose.” Id. Finally, it found that the defendants’ use of the Flying B Logo has no adverse effect on the value of, or the market for, Bouchat’s Shield Drawing. Id. at 697.
From the district court’s judgment in favor of the defendants, entered on November 21, 2008, Bouchat filed this appeal.
II
Recognizing the Copyright Act’s goal “[t]o promote the Progress of Science and useful Arts,” U.S. Const, art. I, § 8, cl. 8, by ultimately providing “access to the products of [authors’] genius,” see Sony *320 Corp. of Am. v. Universal City Studios, Inc., 464 U.S. 417, 429, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984); Bond v. Blum, 317 F.3d 385, 393 (4th Cir.2003), the Copyright Act, through the fair use doctrine, denies authors any monopoly over new works that are derivative and transformative, see Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 579, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994). The fair use doctrine “guarantee[s] ... breathing space within the confines of copyright” for transformative works, and “the more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use.” Id. “A ‘transformative’ use is one that ‘employ[s] the quoted matter in a different manner or for a different purpose from the original,’ thus transforming it.” A.V. ex rel. Vanderhye v. iParadigms, LLC, 562 F.3d 630, 638 (4th Cir.2009) (quoting Pierre N. Leval, Commentary, Toward a Fair Use Standard, 103 Harv. L.Rev. 1105, 1111 (1990)).
The Copyright Act thus provides that the fair use of a copyrighted work is not an infringement of copyright. 17 U.S.C. § 107; see also Sony, 464 U.S. at 433, 104 S.Ct. 774 (“Any individual may reproduce a copyrighted work for a ‘fair use’; the copyright owner does not possess the exclusive right to such a use”).
In determining whether a particular use is fair use, § 107 provides a non-exhaustive list of factors to guide a court:
(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
(2) the nature of the copyrighted work;
(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
(4)the effect of the use upon the potential market for or value of the copyrighted work.
17 U.S.C. § 107. These factors are not to be considered bright-line rules, rigidly applied, see Sony, 464 U.S. at 449 n. 31, 104 S.Ct. 774, but rather are intended to “provide only general guidance,” Campbell, 510 U.S. at 577, 114 S.Ct. 1164. See also Bond, 317 F.3d at 394.
Ill
In this case, the Ravens display the Flying B Logo only in connection with memorabilia and highlights chronicling the first three seasons of the franchise. These memorabilia and game highlights are historical and biographical, and the Ravens’ only purpose in displaying the Flying B Logo now is to recount and recall that history, as the district court found. The incidental and necessary display of the Flying B Logo in connection with these items is totally transformative of the use of the Flying B Logo — changing from its use as the symbol identifying the Ravens’ franchise to its use as an incidental and necessary part of history.
This transformation is fundamental and critical to an analysis of fair use, inasmuch as transformation lies at the “heart” of the fair use doctrine. See Campbell, 510 U.S. at 579, 114 S.Ct. 1164. Virtually every case that has considered such a historical and biographical use has held it to be transformative and therefore fair use. See, e.g., Bill Graham Archives v. Dorling Kindersley Ltd., 448 F.3d 605, 609-10 (2d Cir.2006) (finding the use of images of concert posters in a biographical account of the Grateful Dead to be transformative because the posters were being used to highlight historical facts, a purpose “plainly different from the original purpose for which they were created”); Elvis Presley Enters., Inc. v. Passport Video, 349 F.3d *321 622, 629 (9th Cir.2003) (observing, in the context of a video documentary about the life of Elvis Presley, that “Passport’s use of many of the television clips is transfor-mative because they are cited as historical reference points in the life of a remarkable entertainer”).
The majority overlooks entirely the fact that in 1999, the Ravens and the NFL adopted the Raven Profile Logo as the symbol identifying the Ravens’ franchise. Indeed, it does not even recite that fact. Only with this omission can it conclude that the display now of the Flying B Logo in historical items is for the same purpose for which it was displayed in 1996-98. Were it to recognize the change in identifying logo, the majority would have had to conclude that a transformation in use had occurred that relegates the original display to merely historical interest. Thus, it is simply inaccurate to say, as the majority does, that the Flying B Logo is being used by the Ravens for the same purpose today that it was in the years 1996-98 — it “remains a logo used to identify the Ravens.” Ante at 310.
The display now of the Flying B Logo in memorabilia and game highlights from the Ravens’ first three seasons is both incidental and necessary to the new purpose for which it is being used — recounting and recalling history — inasmuch as history cannot be fabricated or created. To display, in the lobby of the Ravens’ headquarters, 1996 pictures of the Ravens’ 1996 draft choices, Ray Lewis and Jonathan Ogden, as “the team’s first ever first-round NFL draft picks,” ante at 307, is momentous because of their subsequent success as players. The fact that their helmets included the Flying B Logo is an incidental fact of history, made more so by the fact that the Ravens and the NFL no longer use the Flying B Logo to identify the Ravens’ franchise.
In holding that the use of the Flying B Logo in this context is transformative because it “ ‘adds something new1 to [the Logo’s] original purpose as a symbol identifying the Ravens,” ante at 314(quoting Campbell, 510 U.S. at 579, 114 S.Ct. 1164), the majority recognizes this fact. Yet the majority attempts to distinguish this use of the Flying B Logo from its use in game highlights, which, the majority holds, is not transformative. But the display of the Flying B Logo in video highlights from the Ravens’ first three seasons is even more incidental and unimportant than the display of the Logo in the Ravens’ headquarters. The highlights are selected solely because of the team’s play on the field and the importance of that play to the Ravens’ history. There is no evidence or suggestion that the Ravens collected the highlights from the first three years to display the Flying B Logo or to promote the team through it. Any such suggestion could only be fanciful, ignoring entirely the fact that the Ravens and the NFL have identified the Ravens since 1999 exclusively by the Raven Profile Logo.
The Ravens’ use of the Flying B Logo is therefore necessary for its neio purpose of recounting and recalling franchise history, and that use has no value for — indeed it is irrelevant to — the original purpose of identifying the franchise, as the franchise is now identified by the Raven Profile Logo. And it follows that any monetary motive in recounting and recalling history through memorabilia and highlights is based on the value of the history, not the value of the Flying B Logo. As the Supreme Court has pointed out, the inquiry into the commercial nature of a use under the first statutory factor of § 107 is not whether the Ravens received money from the sale of memorabilia or video highlights — as the majority finds important — • but whether the Ravens “stand[ ] to profit *322 from exploitation of the copyrighted matter.” Harper & Row, Publishers, Inc. v. Nation Enters., 471 U.S. 539, 562, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985). Nothing in the memorabilia or game highlights indicates that the Flying B Logo itself provides the Ravens any gain. Rather, it is the nature of the game performances, the players’ performances, and the competition between football teams that provides the Ravens with value from the memorabilia and game highlights.
Indeed, a jury found in 1998 that the Ravens did not earn any profit from the display of the Flying B Logo at a time when the Logo was actually being used as the franchise identifier. It can hardly be argued that the same logo used only incidentally and historically now provides the Ravens with value and somehow denies Bouchat the value of his Shield Drawing. Because the new use — so far removed and so different in purpose from the original use — is completely transformative, any potentially miniscule commercial advantage gained in connection with the new use is outweighed by the sheer magnitude of the transformation. See Campbell, 510 U.S. at 579, 114 S.Ct. 1164 (“[T]he more transfor-mative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use”).
It should not require the Supreme Court to instruct us that the Ravens’ incidental and necessary use of the Flying B Logo in memorabilia and game highlights is trans-formative — the heart of the fair use doctrine' — and therefore does not infringe Bouchat’s copyright. See 17 U.S.C. § 107. Unfortunately, however, it does.
IV
In addition to the transformative character of the Ravens’ use of the Flying B Logo, equitable and practical considerations weigh in favor of finding the use at issue to be fair use. It is indeed true that the Ravens and the NFL infringed Bouc-hat’s copyright in the Shield Drawing during the first three years of the Ravens’ history. But we are not now evaluating the merits of the Ravens’ use of the Flying B Logo to identify the Ravens’ franchise, as it did during the 1996-98 seasons. We accept that as fact. Rather, we are called upon to assess the merits of the Ravens’ new use of the Flying B Logo as an incidental and necessary component of its recorded history.
In making this assessment, it must be noted that Bouchat himself could have avoided some or all of the harm, if any, that he now seeks to redress. Bouchat learned of the potential infringement when the Ravens’ uniform was first introduced in June 1996, long before the beginning of the Ravens’ first season. Yet he did nothing to alert the Ravens or the NFL of his concern. Rather, he let the Ravens play its entire first season with the Flying B Logo as its identifying symbol, thus allowing the creation of the history he now seeks to enjoin. For their part, the Ravens and the NFL stopped using the Flying B Logo — never to use it again to identify the Ravens — as soon as the jury concluded in November 1998 that the Flying B Logo did infringe Bouchat’s Shield Drawing. But by that time the 1996-98 seasons had become history, and during every game that the Ravens played, team members wore uniforms displaying the Flying B Logo.
In seeking now to prohibit the Ravens and the NFL from displaying any photograph or film from the Ravens’ first three seasons in which the Flying B Logo is visible, Bouchat effectively seeks to blot out three years of the Ravens’ football history. Indeed, the remedy Bouchat seeks is even more extensive, as he would *323 also require the NFL to blot out the histories of any of the 24 NFL teams that played the Ravens during the 1996-98 seasons, because the memorabilia and films from those games also include incidental displays of the Flying B Logo.
In truth, Bouchat’s goal in seeking the injunction he now requests cannot be to prohibit the display of the Flying B Logo. An injunction prohibiting any display of the Logo will do him no good, as his Shield Drawing’s notoriety and value depend on the display of the Flying B Logo in connection with the Ravens’ franchise. Rather, through this legal action, Bouchat is attempting to hold the Ravens’ history hostage for ransom. See generally Ronald Coase, The Nature of the Firm, 4 Econó-mica 386 (1937). But it would be grossly inequitable and would bear no relation to the true source of value in the memorabilia and video highlights at issue — namely, their status as historical artifacts — to allow Bouchat to leverage the incidental use of his copyrighted logo into control over the display of all images, video, and memorabilia from the first three years of Ravens history. As an “ ‘equitable rule of reason,’ ” whose terms are not to be rigidly applied, Sony, 464 U.S. at 448 n. 31, 104 S.Ct. 774 (quoting H.R.Rep. No. 94-1476, at 65 (1976), 1976 U.S.C.C.A.N. 5659, at 5679), fair use should be broad enough to allow the Ravens to display the history it created, even though the Flying B Logo will necessarily appear as an incidental aspect of that history.
In short, if fair use is not now recognized in the transformative use of the Flying B Logo — a use only incidental and necessary to the display and sale of memorabilia and game highlights — the policy of the Copyright Act, as explained in Sony and Campbell, will not only be frustrated, but the consequence of any remedy against the Ravens and the NFL will be unreasonable and inequitable. See Christopher Phelps & Assocs., LLC v. Galloway, 492 F.3d 532, 544 (4th Cir.2007) (denying a permanent injunction against the sale of a house built with copyright-infringing architectural plans because such a “draconian burden” was not justified by the right that the plaintiff claimed had been violated).
The Ravens and the NFL cannot now change history nor can they reasonably be requested to blot it out. They have not attempted to reinstate the Flying B Logo as the identifying symbol of the Ravens’ franchise, nor have they focused on the Logo in any way. Rather, they seek only to display memorabilia and historic images which of necessity still contain the Flying B Logo. This is surely a transformative use, lying squarely in the “heart of the fair use doctrine’s guarantee of breathing space within the confines of copyright.” Campbell, 510 U.S. at 579, 114 S.Ct. 1164.
For the foregoing reasons, I would affirm the judgment of the district court, which I conclude is manifestly correct.